**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y

★ SEP 03 2010 ★

**BROOKLYN** OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
RONALD SMILEY,

       Petitioner,

  —against—

DALE ARTUZ, Superintendent,

       Respondent,
------------------------------------------------------------------X

**MEMORANDUM AND ORDER**

05-CV-1446 (SLT)

**TOWNES, United States District Judge:**

  Ronald Smiley ("Smiley" or "Petitioner"), who is incarcerated pursuant to a judgment of the New York State Supreme Court, Queens County, petitions this Court for a writ of habeas corpus under 28 U.S.C. § 2254. On October 20, 2000, Petitioner was convicted of two counts of attempted murder in the second-degree, one count of assault in the first-degree, one count of assault in the second-degree, one count of assault in the third-degree and one count of criminal possession of a weapon in the second-degree. Appearing *pro se*, Petitioner challenges his conviction on five grounds: (1) the evidence was legally insufficient to disprove Petitioner's defense of justification beyond a reasonable doubt; (2) he was denied due process and a fair trial due to inappropriate comments by the prosecutor during closing arguments, including shifting the burden of proof to Petitioner, asking jurors to reach unreasonable conclusions based on gender stereotypes, and referring to Petitioner by his nickname, "Rambo;" (3) Petitioner was denied due process and a fair trial because of the trial judge's failure to provide a missing witness charge to the jury; (4) Petitioner was denied due process because evidence of the misdemeanor charges of assault in the third-degree, which had been previously dismissed, was introduced at trial; and (5) the sentence imposed on Petitioner was unduly harsh and excessive in

light of substantial evidence of self-defense and the People's pre-trial plea offer of six and a half years imprisonment.

For the reasons set forth below, the habeas petition is denied.

# BACKGROUND

I.     People's Case

Petitioner dated Shamika Lindsey for approximately eight to ten years before their relationship ended in May 1998. Trial Transcript ("Tr.") at 189, 190, 214. Smiley is the father of one of Shamika Lindsey's two children. *Id.* at 190. During direct testimony, the prosecutor elicited the fact that Shamika Lindsey is 5'3'' tall and weighs 127 pounds. *Id.* at 266. On the afternoon of August 9, 1998, Smiley encountered Shamika Lindsey, who was dressed up for a date later that evening, and her two children, in an Astoria Projects Park. *Id.* at 190-91. Smiley questioned Shamika Lindsey about her evening plans including whom she had plans to meet. *Id.* at 191-92. She refused to answer. *Id.*

At 7:00 p.m., Shamika Lindsey took her children to her mother's house in the Astoria Housing Projects, where Smiley followed five to ten minutes later. *Id.* at 192. Smiley again questioned her about her plans for the evening and, once again, she refused his request for information. *Id.* The two watched television together until 8:45 p.m., when Smiley left the house immediately after he received a page on his pager. *Id.* at 192-93. Shamika Lindsey left the apartment fifteen minutes later to attend her date. *Id.* at 193.

Shamika Lindsey returned to her mother's apartment between approximately 3:30 to 4:00 a.m., the next morning, on August 10th. *Id.* She testified that Smiley called her mother's apartment ten to fifteen minutes after her arrival. *Id.* at 194. Smiley, upset that Lindsey had gone on a date with another man, shouted profanities and threatened to attack her at her mother's apartment. *Id.* at 195. Smiley told her that he was in a phone booth around the corner from her

2

mother's house. *Id.* at 226. Although Shamika Lindsey ended the call, Petitioner repeatedly called her mother's apartment during twenty-minute intervals. *Id.* at 195-96.

At 8:45 a.m., Shamika Lindsey proceeded to her babysitter's apartment in the next building to drop off her children prior to going to work. *Id.* at 196. Lindsey testified that as she stepped through the threshold of the hallway in her babysitter's building, Smiley began to repeatedly punch her in her face and midsection. *Id.* Their baby daughter's carriage flipped over during the attack. *Id.* As Smiley assaulted Lindsey, he mocked her and yelled profanities, stating she deserved the beating, that she looked ugly, and no one would want her after the beating. *Id.* at 197. Shamika Lindsey suffered injuries to her chest and stomach, a swollen lip, and experienced bleeding and swelling on the right side of her face. *Id.* at 198.

Subsequent to the attack, she brought her children to the babysitter and went to work for fear that her absence would result in the loss of her job. *Id.* After Lindsey left work, she arrived at an Astoria Projects park at 1:30 p.m., where she saw two of Smiley's friends. *Id.* at 199. At that time, Shamika Lindsey was accompanied by her friends, Nicole Rheams and Ms. Maggie, her babysitter, Patty Martin, and Lindsey's younger daughter. *Id.* at 202. Nicole Rheams, who testified at trial, corroborated Shamika's injuries, stating her face was swollen. *Id.* at 271. Approximately a half-hour later, Smiley arrived at the park, carrying a knapsack. *Id.* at 202, 205. He left the knapsack on a table with his friends and approached Shamika Lindsey. *Id.* at 205, 274-75. Smiley taunted Lindsey about the morning attack, threw juice at her, and lunged at her in an attempt to frighten her. *Id.* at 202, 274-75. Shamika Lindsey responded by shouting profanities at Smiley. *Id.* at 203. During this argument, Shamika Lindsey broke a piece of glass and told Smiley "if you fuckin['] touch me, I'm going to cut you." *Id.* at 203. Rheams testified that she pulled Shamika Lindsey away from the argument and convinced her to leave the park.

*Id.* at 276. At this time, the babysitter, Ms. Martin, and Ms. Maggie, removed Shamika Lindsey's daughter from the park. *Id.* at 204.

Smiley pursued Shamika Lindsey and Nicole Rheams as they were leaving the park, yelling and taunting Lindsey as they walked away. *Id.* at 205, 277. As they proceeded toward the park exit, Shamika Lindsey and Rheams observed Shamika's brother, Kevin Lindsey, leaving their mother's building. *Id.* Nicole Rheams spoke with Kevin Lindsey, who subsequently approached Smiley. *Id.* When Rheams spoke with Kevin Lindsey, they were three feet apart from each other. *Id.* at 277-78. Rheams testified that Kevin Lindsey was not carrying a gun. *Id.* Smiley had returned to his friends' table and retrieved his knapsack, before Kevin Lindsey confronted Smiley and told him to leave his sister alone. *Id.* at 206. Shamika Lindsey followed her brother and intervened during their argument. *Id.* at 278-79.

Shamika Lindsey testified that the confrontation between Smiley and Kevin became increasingly heated, and Smiley threatened both Lindseys, stating "I fuckin' kill both of y'al [sic]" and "I'll shoot you . . . I'll kill you all[.]" *Id.* at 207, 250. Kevin Lindsey turned around and began to walk away when Shamika Lindsey observed Smiley reach into the knapsack he was carrying. *Id.* at 207-08. Shamika Lindsey, fearing that Smiley had a gun, immediately grabbed at Smiley's knapsack and yelled for her brother's help. *Id.* at 208. Her brother grabbed Smiley, placed him in a headlock, and Shamika, in an attempt to force Smiley to drop the gun, hit him in the face with the piece of glass that she was carrying. *Id.* at 208, 253-54. After Shamika Lindsey hit Smiley in the face, she dropped the piece of glass. *Id.* at 259. During the struggle, Shamika Lindsey felt a gun in Smiley's knapsack against her stomach. *Id.* Smiley fired the gun numerous times, hitting Kevin Lindsey in the chest with one shot. *Id.* at 208-209. After shooting Kevin Lindsey, Smiley broke free from his grasp and shot Shamika Lindsey in the

4

upper thigh. *Id.* Kevin Lindsey retreated from the park and Smiley fired several shots after him until he had fired all the bullets in the gun. *Id.* at 209-10. Smiley then fled the park. *Id.* at 210. Police and paramedics responded shortly thereafter and transported Shamika and Kevin Lindsey to Elmhurst hospital for treatment for their gunshot wounds. *Id.* at 210-11.

Rheams testified that she witnessed a struggle between the Lindseys and Smiley, but when she heard gunshots, she retreated into the nearest building and only returned outside five minutes later, after the final shots had been fired. *Id.* at 280-81. Upon returning outside, she observed both Lindseys had been shot. *Id.* at 281-82. Gladys Najdeck, a seventeen year-old girl who lived across the street from the Astoria Projects park, heard gunshots from the park and ran to her third floor kitchen window to see what had happened. *Id.* at 324-26. Najdeck observed Smiley firing a gun, with his arm extended. *Id.* at 327-28. Najdeck referred to Smiley by his nickname, "Rambo," when she identified him. According to Najdeck and several other witnesses who testified, including Petitioner himself, Ronald Smiley was known as "Rambo"[1] throughout the neighborhood. *Id.* at 207, 400, 465. Najdeck observed Shamika Lindsey fall to the ground as Smiley, a short distance away, turned his back on Shamika, indicating to Najdeck, that he had just shot her because he was holding a gun and she fell just as he turned his back to her. *Id.* at 345. Another neighbor who lived across the street from the park, Raul Rios, testified that he heard multiple gunshots, and immediately thereafter, his five year-old son, Darren, ran into the room and shouted "Rambo shot Smoke." *Id.* at 394-398. Rios testified that he knew Smiley as "Rambo" and Kevin Lindsey was commonly known by his nickname, "Smoke." *Id.* at 400, 404.

---

[1] Multiple witnesses also referred to Smiley as "Ronbo," used interchangeably with "Rambo."

Police Officer David Sin, the first responding officer, testified that he found a knapsack, approximately four to five feet away from Shamika Lindsey, containing a live round inside. *Id.* at 436-37, 439, 443. Officer Sin also discovered live .38 caliber rounds scattered within a foot of the bag. *Id.* at 442-43.

Petitioner fled the park after the shooting and threw the gun into the East River that same evening. *Id.* at 508. Later that night, Petitioner boarded a bus to North Carolina. *Id.* at 501. Petitioner was apprehended in North Carolina in January 2000 and flew back to New York with Detective Jeanne Walsh-Rivera. *Id.* at 386-87. When they arrived in New York, Detective Walsh-Rivera processed the arrest, and during the course of taking Petitioner's pedigree information, Petitioner asked the detective what Shamika had said. *Id.* at 387-89. Detective Walsh-Rivera replied "she said that you shot her in broad daylight" to which Petitioner responded, "it was an accident." *Id.* at 389. Detective Walsh-Rivera then stopped Petitioner and told him that she could not speak with him about the incident. *Id.*

The People introduced Petitioner's grand jury testimony at trial. During his grand jury testimony, Petitioner denied any physical altercation with Shamika Lindsey, but then claimed that she struck him. *Id.* at 377. Smiley testified that he and Shamika Lindsey argued over Smiley traveling south to visit the mother of one of his children. *Id.* at 370. He stated "she tried to get somebody to kill me." *Id.* He testified that on August 10, 1998, he went to the Astoria Projects park to pick up his daughter. *Id.* While speaking with Kevin Lindsey, Shamika Lindsey hit him in the face with a bottle. *Id.* Kevin Lindsey attacked Petitioner, placing him in a headlock while Shamika Lindsey attacked his back. *Id.* at 370-71. He characterized the Lindsey siblings as the aggressors. *Id.* at 372. During this struggle, Kevin Lindsey and Petitioner fought for a gun and as a result, Petitioner did not point the gun at Kevin Lindsey. *Id.* at 371. Petitioner

denied shooting Shamika or Kevin Lindsey. *Id.* After the incident, Petitioner went to North Carolina to visit one of his children's mother and claimed he did not think there was a need to speak with the police. *Id.* at 375. Most notably, Petitioner testified that he did not own the gun, and it "miraculously showed up in the middle of the tussle." *Id.* at 376.

II.     Petitioner's Case

Petitioner testified in his own defense at trial. He stated that he spoke with Shamika Lindsey at 6:30 p.m., on August 9, 1998. *Id.* at 472. He complimented her on her outfit and asked whether she was going out, to which Shamika replied "none of your fuckin' business." *Id.* at 473. According to Petitioner, he calmly dropped the topic. *Id.* Petitioner accompanied Shamika Lindsey to her mother's apartment at 7:30 or 8:30 p.m., where they, along with their child and Shamika's parents, watched television. *Id.* at 473-74. While they watched television, Petitioner told Shamika that he was going to North Carolina to see his son's mother. *Id.* at 476. Petitioner testified that Shamika reacted angrily, but they did not engage in an argument or physical altercation that night. *Id.* at 475-76. At 9:00 p.m., Smiley received a page and he left the apartment. *Id.* at 475, 477. He then returned to Shamika's mother's house ten to fifteen minutes later, but was told she had left, and he subsequently traveled to his mother's house. *Id.* at 478. Petitioner testified that he called Shamika's mother's home once at 10:30 or 10:45 p.m. and spoke with her mother. *Id.* at 479.

Petitioner encountered Shamika Lindsey and her two daughters at approximately 9:00 a.m. on August 10, 1998, in his babysitter's building. *Id.* at 483. He opened the door for Shamika and offered to take his daughter upstairs to the babysitter but Shamika refused. *Id.* at 484. He attempted to tell Shamika that he was going to North Carolina, but she refused to listen, "so [he] left it alone." *Id.* He testified that there was no argument, however, Shamika Lindsey

screamed at him and called him names. *Id.* Petitioner testified that Shamika Lindsey told him she was going to have him killed. *Id.* at 513-14. Petitioner elaborated that he did not consider this an argument because this interaction was consistent with Shamika's personality. *Id.* He denied attacking Shamika, stating he did not touch her on this occasion and left immediately after she refused his offer to take his daughter upstairs to the babysitter. *Id.* at 484-85.

Petitioner testified that he saw Shamika Lindsey again in the Astoria Projects park at 2:30 p.m. on the same day. *Id.* at 486. He was carrying his oldest daughter's knapsack, which contained her lunch, towel, and bathing suit because she was going to the pool, although "[t]hat day was like a rainy day so she didn't need the bag so I still had the bag with me." *Id.* at 480-81, 486. He approached Shamika Lindsey, however, when she saw him, she stated "get away from me, mother fucker, before I cut you." *Id.* at 487. Petitioner testified he walked away immediately. *Id.* He admitted that he had an orange soda at the time but denied pouring soda or juice on Shamika Lindsey. *Id.* He testified that she had a broken glass bottle in her hand. *Id.*

Shamika Lindsey, accompanied by her daughter, Nicole Rheams, Ms. Patty and Ms. Maggie, started to exit the park and walked toward her mother's building. *Id.* at 488. They encountered Kevin Lindsey as he was leaving his mother's building, and Shamika Lindsey and Rheams spoke with him for a few minutes. *Id.* Kevin Lindsey confronted Smiley, who testified that he left the knapsack on top of a bench and was not carrying anything in his hands. *Id.* at 489. He stated that he never picked up the knapsack. *Id.* According to Petitioner, Kevin Lindsey was supportive of him, stating "[y]ou just go down [to North Carolina]. Go do what you got to do. Go see your son and come back." *Id.* While they spoke, Shamika Lindsey unexpectedly hit Petitioner and Kevin Lindsey put him in a headlock. *Id.* Shamika Lindsey stabbed Petitioner in his back with the glass she was holding. *Id.*

8

Smiley testified that Kevin Lindsey had a reputation for carrying guns in the community and he had previously shown Smiley guns that he carried. *Id.* at 491-93. As Smiley struggled with Kevin and Shamika Lindsey, he saw Kevin was carrying a gun in his waistband and attempted to secure it. *Id.* at 494-95. While Petitioner and Kevin Lindsey fought for the gun, it fired four times. *Id.* at 494. Petitioner testified "[w]hile he was choking me, I can't breathe so I reach for the gun and he grabbed my hands. We both was tusslin' for the gun. He had his hands on the gun and I had my hands on the gun." *Id.* at 495. After the fourth shot, Petitioner knew Kevin Lindsey had been shot and the gun fell to the ground. *Id.* at 497-98. Petitioner denied discharging the gun and testified that Kevin Lindsey's finger was on the trigger. *Id.* at 506-07. Shamika Lindsey released Petitioner, who picked up the gun, retrieved the knapsack from the bench, and left the park. *Id.* at 497. Petitioner stated he "was very scared [and] nervous." *Id.* at 497. During cross-examination, Petitioner testified that Gladys Najdeck lied when she testified that he discharged the weapon several times at Kevin Lindsey, but he did not provide a motive for Najdeck to testify falsely against him. *Id.* at 507. Although he stated the gun belonged to Kevin Lindsey, Petitioner took the gun to Long Island City and later threw it into the East River. *Id.* at 498-501, 508. Petitioner denied that the knapsack that Officer Sin found at the scene and introduced at trial was the same knapsack he carried on the day of the shooting. *Id.* at 500.

Petitioner did not seek a doctor for injuries he sustained during the struggle with the Lindseys because he was nervous, nor did he report the incident to the police for fear that he would be arrested. *Id.* at 520, 525. Smiley also never sought to have Shamika or Kevin Lindsey arrested for attempting to harm or kill him. *Id.* at 525. Petitioner took a bus to North Carolina the night of August 10, 1998. *Id.* at 501. He testified that he called Shamika's mother's house two days after he arrived in North Carolina and Shamika told him that she and Kevin had been

shot and the police were looking for him. *Id.* at 502-03. He spoke with Shamika on five occasions while he was in North Carolina and Shamika was aware of where he was located. *Id.* at 504.

Petitioner denied telling Detective Walsh-Rivera that the shooting was an accident or making any other statement whatsoever. *Id.* at 506. He claimed that he merely inquired about the charges and he was told that they could not tell him anything until he spoke with his attorney. *Id.*

III.   Procedural History

Petitioner was charged with two counts of attempted murder in the second-degree (N.Y. Penal Law §§ 110.00 and 125.25(1)), two counts of assault in the first-degree (N.Y. Penal Law §120.05(2)), criminal possession of a weapon in the second-degree (N.Y. Penal Law § 265.03), and assault in the third-degree (N.Y. Penal Law § 120.00(1)). Prior to trial, the charge for third-degree assault was dismissed for legal insufficiency. The District Attorney's office made a pre-trial plea offer to Petitioner which included a sentence of six and a half years imprisonment, but Petitioner rejected the offer. *Id.* at 2-3. At the conclusion of his trial, Petitioner was convicted of two counts of attempted murder in the second-degree, first and second-degree assault, second-degree criminal possession of a weapon and third-degree assault.[2] Petitioner was acquitted of the first-degree assault count as to Shamika Lindsey but convicted of the lesser-included second-degree assault. On November 3, 2000, the trial court sentenced Petitioner, as a second felony offender, to consecutive determinate fifteen-year prison terms on the two attempted murder counts. Petitioner was sentenced to concurrent determinate prison terms of fifteen years on the

---

[2] Petitioner was improperly convicted of third-degree assault despite the pre-trial dismissal of that charge. After dismissal, the charge was inadvertently submitted to the jury without objection.

first-degree assault count, five years on the second-degree assault, ten years on the second-degree criminal possession of a weapon count, and one year on the third-degree assault count.

Petitioner made the following six arguments on appeal to the Supreme Court of New York, Appellate Division, Second Department: (1) the state failed to disprove his justification defense beyond a reasonable doubt; (2) the jury's verdict was against the weight of the evidence; (3) he was denied a fair trial by multiple instances of prosecutorial misconduct (4) the trial court erred by refusing to issue a missing witness charge relating to Kevin Lindsey; (5) the third-degree assault charge was wrongfully submitted to the jury; (6) his sentence was unduly harsh and excessive. The Appellate Division, Second Department vacated the third-degree assault conviction and the sentence imposed based on that charge, because that charge was dismissed prior to trial. The court affirmed the remainder of the trial court's judgment on March 3, 2003. *See People v. Smiley*, 755 N.Y.S.2d 870 (N.Y. App. Div. 2003). The Appellate Division held "[Petitioner's] contention that the People failed to disprove his justification defense beyond a reasonable doubt is unpreserved for appellate review [and i]n any event, viewing the evidence in the light most favorable to the prosecution (*see People v Contes*, 454 N.E.2d 932 (1983)), we find that it was legally sufficient to disprove the defense of justification beyond a reasonable doubt." *See People v. Smiley*, 755 N.Y.S.2d at 870-71. The Appellate Division also found the sentence imposed was not excessive and that Petitioner's remaining arguments were meritless. *Id.* at 871.

On May 29, 2003, the New York Court of Appeals denied leave to appeal. *People v. Smiley*, 793 N.E.2d 422 (N.Y. 2003). As Petitioner did not pursue his appeal to the United States Supreme Court, the judgment of conviction became final on August 27, 2003, when the ninety-

day period to seek a writ of certiorari from the United States Supreme Court expired. *See*

*Warren v. Garvin*, 219 F.3d 111, 112 (2d Cir. 2000).

Petitioner filed a petition for a writ of habeas corpus on March 10, 2005. This Court held

that this petition was timely filed, as Petitioner sought collateral review on October 20, 2003

from the New York Supreme Court, Appellate Division, in the form of a writ of *error coram*

*nobis*. The Appellate Division denied Petitioner's request, by order dated March 22, 2004.

Pursuant to 28 U.S.C. § 2244(d)(2), the period of time that Petitioner's application to the

Appellate Division was pending is not counted for purposes of calculating the one-year

limitation period under AEDPA. *See* Docket # 19, Mem. and Order (Nov. 26, 2008).

The Court addresses Petitioner's habeas arguments in detail below.

## DISCUSSION

### I. Standard of Habeas Review

Pursuant to 28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death

Penalty Act of 1996 ("AEDPA"), a writ of habeas corpus "shall not be granted with respect to

any claim that was adjudicated on the merits in State court proceedings unless the

adjudication . . . resulted in a decision that was contrary to, or involved an unreasonable

application of, clearly established Federal law, as determined by the Supreme Court of the

United States," 28 U.S.C. § 2254(d)(1), or "resulted in a decision that was based on an

unreasonable determination of the facts in light of the evidence presented." 28 U.S.C.

§ 2254(d)(2).

A state court decision is contrary to clearly established federal law if the state court

applies a rule that contradicts governing Supreme Court precedent or the state court confronts a

set of facts that is materially indistinguishable from a Supreme Court decision and arrives at a

different result. *Williams v. Taylor*, 529 U.S. 362, 413 (2000). A decision is an "unreasonable

application" of federal law if the state court's application of governing Supreme Court precedent is objectively unreasonable. *Id.* at 409, 413; *see also Mask v. McGinnis*, 252 F.3d 85, 88-89 (2d Cir. 2001). An erroneous application of federal law is not necessarily an unreasonable one. *Williams*, 529 U.S. at 410-11. Nevertheless, as interpreted by the Second Circuit, "although [s]ome increment of incorrectness beyond error is required . . . the increment need not be great; otherwise habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence.'" *Mask*, 252 F.3d at 89 (quoting *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000)). On habeas review, State court factual determinations are presumed correct, and the petitioner bears the burden of "rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

## II. Sufficiency of Evidence to Disprove Petitioner's Justification Defense

### A. Procedural Bar

Petitioner argues that the evidence was legally insufficient to disprove his defense of justification. He contends that the evidence demonstrated that he was outnumbered two to one, he was attacked with a broken piece of glass, and he fired the gun while one of his aggressors held him in a headlock, thereby preventing any opportunity of retreat. In response, Respondent argues that Petitioner's claim should be denied because his claim (1) is procedurally barred, as his conviction rests on an independent and adequate state law ground, and (2) fails on the merits.

A claim resolved on independent and adequate state procedural grounds is generally not subject to review on habeas. *See Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991). There are limited circumstances where a federal court may conduct a habeas review of claims resolved on state grounds. Federal review is permissible if the petitioner can demonstrate any one of the following circumstances: (1) actual innocence of the crime charged resulting in a "fundamental

13

miscarriage of justice," *Dunham v. Travis*, 313 F.3d 724, 730 (2d Cir. 2002) (citing *Schlup v. Delo*, 513 U.S. 298, 321 (1995)); (2) cause for the procedural default resulting in prejudice, *see Edwards v. Carpenter*, 529 U.S. 446, 451 (2000); or (3) that the procedural bar that the state court applied is not adequate, *see Cotto v. Herbert*, 331 F.3d 217, 239 (2d Cir. 2003).

Grounds that a district court should consider to determine the adequacy of a state procedural bar are: "(1) whether the alleged procedural violation was actually relied on in the trial court, and whether perfect compliance with the state rule would have changed the trial court's decision; (2) whether state caselaw indicated that compliance with the rule was demanded in the specific circumstances presented; and (3) whether petitioner had 'substantially complied' with the rule given 'the realities of trial,' and, therefore, whether demanding perfect compliance with the rule would serve a legitimate governmental interest." *Clark v. Perez*, 510 F.3d 382, 391 (2d Cir. 2008) (quoting *Cotto*, 331 F.3d at 240).

New York's contemporaneous objection rule has been found to be a "firmly established and regularly followed New York procedural rule," noncompliance with which precludes federal habeas review absent a finding that such treatment would be "exorbitant" under the *Cotto* guideposts. *Garvey v. Duncan*, 485 F.3d 709, 718 (2d Cir. 2007); *Richardson v. Greene*, 497 F.3d 212, 219 (2d Cir. 2007); *Stewart v. Greene*, No. 05 Civ. 0566, 2009 WL 4030833, at *14-15 (S.D.N.Y. Nov. 19, 2009); *Cherry v. Walsh*, No. 09-CV-1452, 2009 WL 2611225, at *9-10 (E.D.N.Y. Aug. 25, 2009).

At the conclusion of the People's case and upon the close of all evidence, Petitioner's counsel made a general motion for dismissal of each and every count of the indictment as not supported as a matter of law by the evidence. Tr. at 532. Petitioner did not move for dismissal on the specific basis that the prosecution failed to present legally sufficient evidence to disprove

14

his justification defense. On direct appeal, the Appellate Division found that Petitioner did not preserve his legal insufficiency challenge. *See People v. Smiley*, 755 N.Y.S.2d at 870. Although the Appellate Division's order is unclear as to the grounds upon which it relied in determining that the objections to the sufficiency of the evidence were unpreserved, it is likely that the Appellate Division relied upon New York's contemporaneous objection rule, C.P.L.R. § 470.05(2). *See Dunn v. Sears*, 561 F. Supp. 2d 444, 454 (S.D.N.Y. 2008) (finding state court ruling that challenge was unpreserved likely relied on contemporaneous objection rule); *Rosario v. Burge*, 542 F. Supp. 2d 328, 337 (S.D.N.Y. 2008) (same). The Appellate Division's decision would bar Petitioner's claim because a party must make a specific protest at the time of a claimed error to preserve an issue for appellate review. *See, e.g., People v. Hardy*, 791 N.Y.S.2d 513, 517 n.3 (2005); *People v. Gray*, 629 N.Y.S.2d 173, 175 (1995).

Although the Appellate Division additionally found that Petitioner's claim, even if reviewed, would be meritless, the alternative ruling on the merits does not remove the procedural bar created by the independent and adequate state ruling. *See Velasquez v. Leonardo*, 898 F.2d 7, 9 (2d Cir. 1990) ("[F]ederal habeas review is foreclosed when a state court has expressly relied on a procedural default as an independent and adequate state ground, even where the state court has also ruled in the alternative on the merits of the federal claim."); *see also Harris v. Reed*, 489 U.S. 255, 264 n.10 (1991). Therefore, the Appellate Division's determination that Petitioner failed to preserve objections to the sufficiency of the evidence reflected a reliance on an independent state procedural rule, despite its alternative ruling on the merits. *See Harris*, 489 U.S. at 264 n.10.

The Court now turns to the *Cotto* guideposts to determine whether the procedural bar is adequate and notes that it recently decided a case with a virtually identical habeas claim:

As to the first *Cotto* guidepost, the question of whether the trial judge "actually relied on" the procedural default "is less applicable in this case because the lack of a contemporaneous objection would not, almost by definition, be mentioned by the trial court." *Cotto v. Herbert*, 331 F.3d 217, 242 (2d Cir. 2003); *see also Karimzada v. Cunningham*, No. 09-CV-3317, 2010 WL 5979471, at *3 n. 1 (E.D.N.Y. Feb. 17, 2010). Moreover, the issue of "whether perfect compliance would have changed the outcome, "is less relevant" in evaluating the failure to preserve a claim." *Stewart v. Greene*, No. 05 Civ. 0566, 2009 WL 4030833 at *15 (S.D.N.Y. Nov. 19, 2009) (quoting *Ashley v. Burge*, No. 05 Civ. 4497(JGK), 2006 WL 3327589, at *5 (S.D.N.Y. Nov. 3, 2006)). As noted by the Court in *Cotto*, "the likely impact of a timely objection involves a certain degree of speculation." *Cotto*, 331 F.3d at 243; *see also Donaldson v. Ercole*, No. 06-5781-pr, 2009 WL 82716, at *2 (2d Cir. Jan. 14, 2009) (summary order).

As to the second *Cotto* factor, New York courts have consistently required compliance with the contemporaneous objection rule in similar circumstances. *See People v. Hines*, 97 N.Y.2d 56, 62 (N.Y. 2001); *see also Farino v. Ercole*, No. 07CV3592, 2009 WL 3232693, at *8-*9 (E.D.N.Y. Sept. 30, 2009); *Fernandez v. Smith*, 558 F.Supp.2d 480, 491 (S.D.N.Y. 2008). Turning to the third *Cotto* guidepost, [Petitioner] did not "substantially comply" with the contemporaneous objection rule. His general motion to dismiss for the failure to prove a prima facie case was not sufficient to preserve his specific challenge to the sufficiency of evidence to disprove his justification defense. Defense counsel had an opportunity to make this specific argument when it would have been "uncomplicated and straightforward" to do so. *Monroe v. Kuhlman*, 433 F.3d [236,] 245 [(2d Cir. 2006)]. His failure to raise it before the trial judge precluded appellate review. *People v. Hines*, 97 N.Y.2d 56, 62 (N.Y. 2001).

*Flores v. Ercole*, No. 06-CV-6751, 2010 WL 1329036, at *6 (E.D.N.Y. Mar. 31, 2010).

Petitioner's counsel raised a general motion to dismiss at the close of the evidence, similar to

Petitioner's actions in *Flores*. Smiley's counsel did not "substantially comply" with the

contemporaneous objection rule by failing to make a specific objection and as such, the issue

was not preserved for appellate review. Absent a showing of prejudice or a fundamental

miscarriage of justice in connection with Petitioner's failure to preserve his objection, which

Petitioner has not attempted to demonstrate, Petitioner's claim for habeas relief based on insufficient evidence to disprove his justification defense is procedurally barred. *See Flores*, 2010 WL 1329036, at *7 (citing *Monroe v. Kuhlman*, 433 F.3d at 240-41.

### B. Petitioner's Claim is Without Merit

Assuming, *arguendo*, Petitioner's claim was not procedurally barred, it is, nevertheless, without merit. The Due Process Clause of the Fourteenth Amendment protects a defendant in a criminal case against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crimes with which he is charged. *See Fiore v. White*, 531 U.S. 225, 228-29 (2001) (per curiam); *Jackson v. Virginia*, 443 U.S. 307, 315 (1979). "This standard applies with equal force to the sufficiency of proof as to a defense, such as justification under N.Y. Penal Law §§ 25.00(1), 35.00 which the prosecution is required to disprove beyond a reasonable doubt." *Ledesma v. Cunningham*, No. 03 Civ. 6322, 2004 WL 1775677, at *11 (S.D.N.Y. Aug. 10, 2004).

A petitioner who challenges a conviction on the sufficiency of the evidence bears a "very heavy burden." *United States v. Quattrone*, 441 F.3d 153, 169 (2d Cir. 2006); *Ponnapula v. Spitzer*, 297 F.3d 172, 179 (2d Cir. 2002). A habeas petitioner claiming that there was insufficient evidence supporting the conviction is entitled to relief under 28 U.S.C. § 2254 only if "upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Jackson*, 443 U.S. at 324; *see also Schlup v. Delo*, 513 U.S. 298, 323 n. 38 (1995). This inquiry "does not focus on whether the trier of fact made the *correct* guilt or innocence determination, but rather whether it made a *rational* decision to convict or acquit." *Herrera v. Collins*, 506 U.S. 390, 402 (1993) (emphasis in original). The habeas court is required to consider the evidence in the light most favorable to the prosecution, and draw all

inferences in its favor. *Jackson*, 443 U.S. at 319. "When considering the sufficiency of the evidence of a state conviction, '[a] federal court must look to state law to determine the elements of the crime.'" *Ponnapula*, 297 F.3d at 179 (quoting *Quartararo v. Hanslmaier*, 186 F.3d 91, 97 (2d Cir. 1999).

Under New York law, justification for the use of "deadly physical force" required a "reasonable belie[f]" by the defendant that the person upon whom such force was used was himself "using or about to use" deadly physical force. *See* N.Y. Penal Law § 35.15(2)(a). In addition, the use of deadly physical force was not justified where the actor could have "retreat[ed]" with "complete safety . . . to himself. . . ." *Id.*

At trial, the People presented legally sufficient evidence establishing that the victims did not brandish a gun during the altercation and that Petitioner's use of deadly force was not justified. Shamika Lindsey testified that Petitioner approached her in the Astoria Projects park, taunted her about assaulting her earlier that morning, threw juice at her, and repeatedly lunged at her in an attempt to frighten her. After shouting back at Petitioner and threatening to cut him with a piece of broken glass in the event he attacked her, Lindsey began to leave the park. As Lindsey and Nicole Rheams exited the park, Petitioner followed them and continued to taunt Shamika Lindsey. Lindsey and Rheams observed Kevin Lindsey leave his mother's building and approached him in an effort to have him speak with Smiley. Smiley threatened to shoot and kill both Lindseys. As Kevin Lindsey turned his back on Petitioner, Shamika Lindsey observed Petitioner reach into the knapsack. Fearing that Petitioner had a gun after she heard his threats, she immediately grabbed the knapsack and yelled for her brother's help. During the struggle that ensued, Shamika Lindsey hit Petitioner across the face with a piece of glass, Kevin Lindsey put Petitioner in a headlock and Shamika Lindsey felt a gun in Petitioner's knapsack against her

18

stomach. Petitioner fired the gun numerous times, hitting Kevin Lindsey in the chest once and Shamika Lindsey once in the thigh. Smiley fired several shots at Kevin Lindsey as Kevin retreated from the park.

Multiple witnesses corroborated portions of Shamika Lindsey's testimony. Nicole Rheams testified Shamika Lindsey's face was swollen on the afternoon of August 10, 1998. She testified that Petitioner threw juice at Shamika Lindsey and followed her as she attempted to leave the park. Gladys Najdeck testified Smiley fired a gun, with his arm extended, as Shamika Lindsey fell to the ground nearby. Raul Rios testified that, after he heard multiple gunshots, his five year-old son, Darren, shouted "Rambo shot Smoke," referring to Petitioner shooting Kevin Lindsey.

Petitioner was the only witness who testified that Shamika Lindsey initiated the attack and shooting. Nevertheless, Petitioner's testimony contained a number of inconsistencies, notably his version of events during the grand jury and trial testimony differed and he stated that Kevin Lindsey attacked him despite verbally supporting him in a conversation that occurred mere seconds before the struggle. Viewing the evidence in the light most favorable to the prosecution, a reasonable jury could have rejected Petitioner's justification defense and found that the evidence presented at trial by prosecution witnesses was sufficient to support a conviction. Thus, the Court finds that even if Petitioner's sufficiency claim were not procedurally barred, it is, nonetheless, meritless.

### III. Denial of Due Process and Fair Trial Based on Comments Made by Prosecutor

Petitioner next contends that the prosecutor acted improperly at trial by (1) urging the jury to make unreasonable factual conclusions based on gender stereotypes; (2) repeatedly referring to Petitioner by his nickname "Rambo"; (3) cross-examining Petitioner regarding

whether the People's witnesses lied during their testimony; and (4) stating that the jury should convict Petitioner if they found that his testimony was not credible and acquit Petitioner if they believed the People's witnesses lied, thereby impermissibly reversing the burden of proof. Respondent argues that the Appellate Division found this claim to be meritless, and as Petitioner has not demonstrated the Appellate Division's decision was contrary to, or an unreasonable application of, clearly established Supreme Court law, this claim fails.

Generally, a prosecutor's comments will not form the basis for habeas relief of a state court conviction unless the remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (internal quotation marks omitted). "[I]t is not enough that the prosecutor['s] remarks were undesirable or even universally condemned." *Id.* (alterations added). "A criminal conviction 'is not to be lightly overturned on the basis of a prosecutor's comments standing alone' in an otherwise fair proceeding." *Gonzalez v. Sullivan*, 934 F.2d 419, 424 (2d Cir. 1991) (quoting *United States v. Young*, 470 U.S. 1, 11 (1985)). "Remarks of the prosecutor in summation do not amount to a denial of due process unless they constitute 'egregious misconduct.'" *United States v. Shareef*, 190 F.3d 71, 78 (2d Cir. 1999) (quoting *Donnelly v DeChristoforo*, 416 U.S. 637, 647 (1974)). A prosecutor's remarks, even if improper and beyond the bounds of fair advocacy, will not warrant habeas relief unless the remarks caused the Petitioner substantial prejudice. *Bradley v. Meachum*, 918 F.2d 338, 343 (2d Cir. 1990). In considering this issue, a district court must evaluate the statements against the backdrop of the whole trial and should consider (1) the severity of the misconduct, (2) the measures adopted to cure the misconduct, and (3) the certainty of conviction absent the improper statements. *See Tankleff v. Senkowski*, 135 F.3d 235, 252 (2d Cir. 1998).

During cross-examination, the People established that Petitioner was seven inches taller than Shamika Lindsey. Tr. at 516. During his summation, the prosecutor asked the jury whether it is "more consistent with common sense that the man would be the one who gets jealous? Is it more consistent with common sense that the man is the one who's going to get physically violent?" *Id.* at 612. Although these questions were based upon a premise that was both stereotypical and biased, the prosecutor then continued to argue that the jury must reach its verdict "based upon the evidence that you have heard in this case" and that corroborating evidence supported the conclusion that Petitioner "was the initial aggressor." *Id.* at 613.

In evaluating Petitioner's basis for prosecutorial misconduct, the Court notes that there was ample evidence from which to conclude that Petitioner produced a gun from his knapsack and shot Shamika and Kevin Lindsey. The prosecutor's comments fell outside of the bounds of fair advocacy, but they caused Petitioner no "substantial prejudice" and thus, Petitioner's due process rights were not violated. *See, e.g., Dickens v. Herbert*, No. 00 CIV. 3249, 2002 WL 1728514, at *7-10 (S.D.N.Y. July 25, 2002) (no habeas relief where prosecutor's comments in summation did not result in substantial prejudice). Similarly, the prosecutor's reference to Petitioner as "Rambo" or "Ronbo" did not substantially prejudice Petitioner during his trial. Petitioner acknowledged his nickname was "Rambo" and multiple witnesses testified that they knew Petitioner only by that nickname. There is no evidence that the jury drew any negative inferences from the People's use of Petitioner's nickname and indeed, Petitioner used the nickname himself during the course of his trial. Tr. at 569.

The Court is led to the same conclusion with respect to Petitioner's argument that the prosecutor improperly cross-examined Smiley when he questioned him about whether the People's witnesses had lied during the course of the trial. The Court does not find this line of

questioning to be improper as the questions were in response to and a reiteration of questions asked by defense counsel on direction examination about the credibility of the testimony of prosecution witnesses. On direct examination, Petitioner's testimony directly contradicted the testimony of numerous prosecution witnesses, including Shamika Lindsey, Nicole Rheams, Gladys Najdeck and Detective Walsh-Rivera. As an example, on direct examination of Petitioner, the following colloquy occurred between Petitioner and his defense counsel,

> Q. Do you remember there was a witness here who testified in this case that after Kevin and Samika were on the ground that you picked up the gun and you held it out and you were firing at Kevin Lindsey? Did you hear that testimony?
> A. Yeah, I hear that testimony.
> Q. Is that true?
> A. That's a lie.

*Id.* at 507. The prosecutor was free to explore this issue. The trial judge provided multiple instructions to the jury that the People had the burden to prove Petitioner's guilt and that burden remained on the prosecution even in the face of Petitioner's choice to testify at trial. As mentioned above, the People presented more than ample evidence to support a conviction for every charge in the indictment.

Finally, Petitioner's argument that the prosecutor's comments that the jurors should convict Petitioner if they found his testimony was not credible and acquit him if they did not believe the People's witnesses, improperly shifted the burden of proof, is without merit. In his summation, Petitioner's counsel attacked the People's witnesses' credibility. He characterized Shamika Lindsey as a "volatile" woman, who fabricated portions of her testimony, and whose testimony was "opposite" of Petitioner's version of events. Tr. at 574-75, 579. Petitioner's counsel labeled Gladys Najdeck's testimony "preposterous," and suggested that she testified against Petitioner because she was friendly with the Lindseys. *Id.* at 570. Petitioner also attacked Raul Rios's credibility during summation. *Id.* at 582. The prosecutor's comments were

22

in fair response to Petitioner's attorney's closing comments. *See Ayala v. Ercole,* 2007 WL

1135560, at *17 (E.D.N.Y. Apr.17, 2007) ("a prosecutor is permitted to respond in an

appropriate manner to attacks on the government's case by defense counsel during his

summation, including attacks on the credibility of government witnesses."). Thus, the

prosecutor's comments did not "so infect[] the trial with unfairness as to make the resulting

conviction a denial of due process" and, accordingly, this basis for habeas relief is rejected. *See*

*Darden,* 477 U.S. at 181.

### IV. Missing Witness Charge

Petitioner's next ground for habeas relief is his contention that he was denied due process

and a fair trial by the trial court's failure to issue a missing witness charge regarding Kevin

Lindsey to the jury. Petitioner asserts that Kevin Lindsey should not have been considered

"unavailable" because he was on probation in Queens County and met with his probation officer

during the course of the trial. Respondent asserts that Petitioner's argument is not based on

clearly established Supreme Court precedent.

A trial court's "failure to give [a missing witness] charge will rarely support reversal or

habeas relief." *Manning v. Walker,* No. 99-cv-5747, 2001 WL 25637, at *9 (E.D.N.Y. Jan. 3,

2001) (internal quotation marks omitted) (alteration added). Petitioner fails to cite any clearly

established Supreme Court precedent requiring a trial court to instruct the jury with respect to a

missing witness. *See Dell v. Ercole,* No. 06-CV-1724, 2009 U.S. Dist. LEXIS 17360, at *16

(E.D.N.Y. Mar. 6, 2009) ("no clearly established Supreme Court precedent requiring a trial court

to instruct the jury with respect to a missing witness") (quoting *Morales v. Strack,* No. 99-CV-

1617, 2003 WL 21816963, at *4 (E.D.N.Y. July 3, 2003)). "When the alleged error is one of

omission, the petitioner's burden is 'especially heavy' because it "is less likely to be prejudicial

than a misstatement of the law." *McBean v. Warden*, No. 08-cv-0150, 2008 WL 5169549, at *18 (N.D.N.Y. Dec. 9, 2008) (internal quotation and citation omitted).

"Whether a missing witness charge should be given lies in the sound discretion of the trial court." *Morales*, 2003 WL 21816963, at *4 (quoting *Reid v. Senkowski*, 961 F.2d 374, 377 (2d Cir. 1992)); *see also Kirkby v. Filion*, 644 F. Supp. 2d 299, 307 (W.D.N.Y. 2009) ("Kirkby's missing witness charge claim raises only an issue of state law that cannot justify federal habeas relief.").

To obtain a missing witness charge under New York State law, a defendant must demonstrate the following factors regarding the witness in question: (1) the witness had knowledge material to the trial; (2) the witness was expected to give noncumulative testimony favorable to the party against whom the charge is sought; and (3) the witness is available to the party who would be expected to call the witness. *McCrone v. Brown*, No. 9:07-cv-0077, 2008 WL 724234, at *9 (N.D.N.Y. Mar. 17, 2008) (citing *People v. Savinon*, 791 N.E.2d 401, 404; (N.Y. 2003)); *see also McKinney v. Burge*, 9:04-CV-1150, 2009 WL 666396 at *36 (N.D.N.Y. Mar. 10, 2009).

The People did not call Kevin Lindsey during its case-in-chief, and Petitioner's counsel requested a missing witness charge at the conclusion of the People's case. Tr. at 455. After the close of evidence, Justice Kron held an evidentiary hearing to determine whether the People demonstrated diligent efforts to locate Mr. Lindsey or whether his charge to the jury should include a missing witness instruction, in accordance with *People v. Gonzalez*, 68 N.Y. 2d 424 (N.Y. 1986). *Id.* at 533.

Detective Vito Navarra, a detective investigator in the District Attorney's Office for Queens County, testified regarding his efforts to locate Kevin Lindsey. Detective Navarra

24

visited and served a subpoena at Kevin Lindsey's mother's house in the Astoria projects approximately eight times, including February 15 and 17, August 28 and 30, September 8, and October 12 of 2000. *Id.* at 537. Kevin Lindsey was not present at his mother's house during any of these visits. *Id.*

Detective Navarra spoke with Shamika Lindsey, who informed him that Kevin Lindsey did not want to get involved in the case nor would he voluntarily testify. *Id.* at 538. Shamika Lindsey told Detective Navarra that the best place to locate him was their mother's house or in that area. *Id.* Detective Navarra served Charles Lindsey at his home with a subpoena for his brother, Kevin, on February 17, 2000, but Charles informed Detective Navarra that Kevin did not live there. *Id.*

Detective Navarra ran a rap sheet on Kevin Lindsey, which initially showed no criminal record. *Id.* After receiving an additional New York State Identification ("NYSID") number for Kevin Lindsey, Navarra ran another rap sheet which listed an additional address in Long Island, New York. *Id.* at 539. Detective Navarra visited the Long Island address but no one answered the door. *Id.* at 540. He canvassed the neighborhood and spoke with several neighbors, who reported that, although Kevin Lindsey was known in the neighborhood, he did not live there. *Id.* Detective Navarra discovered that Kevin Lindsey was on probation and subsequently contacted his probation officer, Ken Stock. *Id.* at 539. Stock told Detective Navarra that Kevin Lindsey did not want to testify at trial and the Stock told Lindsey he was under no obligation to do so. *Id.* Stock explained to Lindsey that the shooting occurred prior to his placement on probation and thus, the probation department would not get involved. *Id.*

The Department of Probation provided Detective Navarra with a work address for Kevin Lindsey, but it proved to be incorrect. *Id.* at 540. Detective Navarra eventually ascertained an

additional address to locate Kevin, at a barbershop, the day prior to this evidentiary hearing. *Id.* at 540-41. Detective Navarra spoke with Kevin Lindsey on the barbershop's telephone line. *Id.* at 541. Kevin Lindsey told Detective Navarra that he did not want to testify and his probation officer assured him that he did not have to do so. *Id.* After Detective Navarra's conversation with Lindsey, the District Attorney's office sent Detective George Sanchez to the barbershop, with a subpoena for Kevin Lindsey, but Detective Sanchez was unable to locate him. *Id.* at 542. Detective Navarra learned that Kevin Lindsey left the barbershop immediately after their telephone conversation. *Id.*

Justice Kron found that the People sustained their burden and proved that the "witness's whereabouts were unknown and that diligent effort to obtain him to testify were unsuccessful." *Id.* at 559. Although Justice Kron refused to provide a missing witness charge, he stated

> [t]hat in no way impinges on your right, Mr. Middler, despite the absence of a missing witness charge, based on standard language, that evidence is based on that the strength of the People's case is based on the evidence or lack of evidence. That in no way impinges on your right to argue during your final arguments that the jury did not hear from Kevin Lindsey in this case. So I'm not going to give a missing witness charge but certainly free to argue a reasonable doubt based on the evidence or lack of evidence and his failure and apparent intentional refusal to come in to testify indicates a lack of evidence establishing the charges as they pertain to your client insofar as the charges involving Kevin Lindsey.

*Id.* at 559-60.

As noted above, in a habeas corpus proceeding, a state court's findings of fact are presumptively correct, in the absence of clear and convincing evidence that they are incorrect. 28 U.S.C. § 2254(e)(1). Petitioner argues that Detective Navarra did not question Kevin Lindsey's brother, mother, friends or employers about Petitioner's whereabouts and he did not use any public records, such as telephone directories, social security records, or department of

motor vehicle records. However, Petitioner offered no evidence whatsoever that these records would have yielded Kevin Lindsey's location. Petitioner fails to demonstrate clear and convincing evidence that the trial court's finding that Kevin Lindsey was unavailable was incorrect, and it must, therefore be presumed correct. *See Moultrie v. Marshall*, No. 06 Civ. 5419, 2009 U.S. Dist. LEXIS 89039, at *19-20 (S.D.N.Y. June 3, 2009) (denying habeas relief on claim alleging failure to give missing witness instruction where petitioner failed to rebut presumption of correctness accorded to trial court's factual determination by clear and convincing evidence); *Crews v. Herbert*, 586 F. Supp.2d 108, 114 (W.D.N.Y. 2008) (same).

Moreover, Justice Kron ruled that Petitioner's counsel was free to argue on summation that the jury did not hear from Kevin Lindsey in this case and reasonable doubt exists based on lack of evidence and Lindsey's failure to testify. Indeed, Petitioner's counsel argued those exact points during closing arguments. Tr. at 580-81. Thus, by commenting on Kevin Lindsey's absence at trial, counsel alleviated any potential error in the court's failure to issue a missing witness charge. *See Brown v. Spitzer*, No. 05 Civ. 1553, 2007 WL 2406870, at *8 (E.D.N.Y. Aug. 21, 2007) ("[P]etitioner's trial counsel was granted the right to argue in closing that the jury should draw an adverse inference from the failure to call [the witness], for whatever that was worth, and the cases have recognized that counsel's closing argument as to an allegedly missing witness cures the failure to charge, if one would be required."). Accordingly, Petitioner has failed to show a basis for habeas corpus relief.

## V. Denial of Due Process as a result of evidence of a previously dismissed assault charge introduced at trial

Petitioner next argues that he was denied due process because evidence of the alleged assault that occurred on the morning of August 10th but was dismissed prior to the trial's commencement was introduced at trial and the charge was submitted to the jury. Respondent

contends this claim has not been exhausted, is procedurally barred, not based on clearly established Supreme Court law, and is meritless.

The Appellate Division vacated Petitioner's assault conviction because, although it had been dismissed prior to the commencement of trial, it was inadvertently submitted to the jury at the close of evidence. When fewer than all criminal counts have been dismissed at trial or reversed on appeal, a court must determine whether prejudicial spillover from evidence introduced in support of the dismissed or reversed counts requires the remaining convictions to be upset. *United States v. Rooney*, 37 F.3d 847, 855 (2d Cir. 1994). In assessing the "spillover effect" on the remaining counts, reviewing courts consider "whether the totality of the circumstances requires reversal of some or all of the remaining counts." *United States v. Wapnick*, 60 F.3d 948, 953 (2d Cir. 1995) (internal quotation marks omitted); *see also People v. Baghai-Kermani*, 644 N.E.2d 1004, 1007 (N.Y. 1994) ("Whether an error in the proceedings relating to one count requires reversal of convictions on other jointly tried counts is a question that can only be resolved on a case-by-case basis, with due regard for the individual facts of the case, the nature of the error and its potential for prejudicial impact on the over-all outcome.").

In evaluating a claim of prejudicial spillover of evidence from an invalidated count, the Second Circuit looks to four factors: (1) whether the evidence from the invalidated count would have incited or aroused the jury to convict the defendant on the remaining counts; (2) whether the reversed and remaining counts arose out of similar facts, the evidence of which would have been admissible as to both; (3) whether the evidence on the reversed count and on the remaining counts was completely dissimilar, permitting the inference that the jurors were able to keep the evidence separate; and (4) whether the strength of the government's case on remaining counts could withstand the potential spillover prejudice. *United States v. Gore*, 154 F.3d 34, 48-49 (2d

Cir. 1998).

The first prong of this test is not met where "the evidence that the government presented on the reversed counts was, as a general matter, no more inflammatory than the evidence that it presented on the remaining counts." *United States v. Morales*, 185 F.3d 74, 83 (2d Cir. 1999), *cert. denied*, 529 U.S. 1010 (2000). As to the second and third factors, prejudicial spillover is unlikely if the dismissed count and the remaining counts were either quite similar or quite dissimilar. *United States v. Hamilton*, 334 F.3d 170, 182 (2d Cir. 2003). "In cases where the vacated and remaining counts emanate from similar facts, and the evidence introduced would have been admissible as to both, it is difficult for a defendant to make a showing of prejudicial spillover. . . . By the same token, where the vacated and remaining counts arise out of completely distinct fact patterns, and the evidence as to both counts is readily separable, there is also no prejudicial spillover." *Id.* at 182-83 (quoting *Wapnick*, 60 F.3d 948, 954 (2d Cir. 1995)). The second and third factors are only satisfied if the prosecution introduces evidence regarding a vacated count that would otherwise be inadmissible on the remaining counts, and "this evidence is presented in such a manner that tends to indicate that the jury probably utilized this evidence in reaching a verdict on the remaining counts[.]" *Id.* at 183 (quoting *Rooney*, 37 F.3d at 856).

In applying the first step of the prejudicial spillover analysis to this case, it is difficult to say that the evidence pertaining to the alleged beating on the morning of the shooting would incite or arouse the jury anymore than the evidence introduced regarding the multiple shooting itself. The Court need not decide whether Petitioner satisfies this prong as he is unable to demonstrate the remaining steps have been satisfied. The evidence regarding the alleged assault is sufficiently dissimilar from the evidence pertaining to the shooting. The evidence of events supporting the remaining counts is factually and temporally distinct from the events relating to

the dismissed assault. The People presented testimony from four witnesses describing Petitioner's confrontation with Shamika and Kevin Lindsey at the Astoria Projects Park and his subsequent use of a gun. In assessing the strength of the government's case on the remaining counts, the testimonial and physical evidence against Petitioner was substantial. Thus, the relevant factors weigh against Petitioner's prejudicial spillover argument. The Court finds this argument lacks merit.

## VI. Petitioner's Sentence Was Not Excessive or Unduly Harsh

Petitioner's final basis for habeas relief is that his sentence was excessive and unduly harsh. Respondent counters that Petitioner's argument does not raise a federal constitutional issue.

Because a habeas court must grant considerable deference to legislatively mandated terms of imprisonment, successful challenges to sentences are "exceedingly rare." *See Hutto v. Davis*, 454 U.S. 370, 374 (1982) (per curiam). The Second Circuit has stated that "[n]o federal constitutional issue is presented where . . . the sentence is within the range prescribed by state law." *White v. Keane*, 969 F.2d 1381, 1383 (2d Cir. 1992) (per curiam).

Petitioner was sentenced to determinate prison terms of fifteen years on his conviction of the two attempted second-degree murder counts to run consecutively with respect to each other, and concurrent prison terms of fifteen years for first-degree assault, five years for second-degree assault, and ten years for second-degree criminal possession of a weapon. The sentences imposed were within New York's prescribed range for the crimes for which he was convicted. The court also properly sentenced Petitioner to consecutive prison terms of fifteen years for two attempted murder counts. *See* N.Y. Penal Law § 70.25(2); *see also Grimes v. Goord*, 371 F. Supp. 2d 305, 319-20 (W.D.N.Y. 2004). This claim is not a proper basis for habeas relief, and,

accordingly, must fail.

## CONCLUSION

The application for a writ of habeas corpus is denied, and the petition is dismissed.

Because petitioner has not "made a substantial showing of the denial of a constitutional right,"

28 U.S.C. § 2253(c)(2), the Court declines to issue a certificate of appealability.

**SO ORDERED**.


/SANDRA L. TOWNES )
United States District Judge

Dated: September / , 2010
      Brooklyn, New York